CHRISTOPHER E. MARTIN (Az. Bar No. 018486),
admitted *pro hac vice*
Email:  martinc@sec.gov

Attorney for Plaintiff
Securities and Exchange Commission
Christopher E. Martin, Senior Trial Counsel
1961 Stout Street, Suite 1700
Denver, Colorado 80294
Telephone: (303) 844-1106
Facsimile: (303) 297-3529

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>     vs.<br><br>BRADLEY C. REIFLER,<br><br>          Defendant,<br><br>and<br><br>FOREFRONT PARTNERS, LLC<br>FOREFRONT CAPITAL SERVICES, LLC, and<br>PORT ROYAL-NCM, LLC,<br><br>          Relief Defendants. | Case No. -----------------<br><br>**COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff, United States Securities and Exchange Commission (the "SEC"), alleges as follows:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§

77t(b), 77t(d)(1), and 77v(a)]; Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa(a)]; and Sections 209(d), 209(e)(1), and 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9(d), 80b-9(e)(1), and 90b-14].

2.    Defendant and Relief Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

3.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14], because certain of the transactions, acts, practices, and courses of business constituting violations of the federal securities laws occurred within this district.  As explained in more detail below, an entity located in this district was defrauded by Defendant Bradley C. Reifler ("Defendant" or "Reifler") out of $6 million and served as the trustee to a reinsurance trust (for whom Reifler served as the investment adviser), which lost approximately $26.5 million as a result of Reifler's misconduct.

4.    Reifler and Relief Defendants Forefront Partners, LLC ("Forefront Partners"), Forefront Capital Services, LLC ("Forefront Capital Services"), and Port Royal-NCM, LLC ("Port Royal-NCM") (collectively, "Relief Defendants") entered into three separate tolling agreements to toll the running of any statute of limitations against each of them from September 10, 2019, through the filing of this complaint. Accordingly, based on these tolling agreements and the applicable statute of limitations, the SEC's claims for monetary relief are not limited by the statute of limitations because all of Reifler's misconduct related to this case took place after September 11, 2014.

## SUMMARY

5.     Defendant Bradley C. Reifler's fraudulent conduct began in November 2014 when he raised $6 million from an investor and then misappropriated those funds.  Specifically, Reifler raised $6 million from a Nevada-Chartered trust company ("Nevada-Chartered Company") by representing that an entity that he controlled would use the funds to provide short-term financing to telecommunications companies.  Instead, Reifler misappropriated the $6 million and used the funds to:  (i) support real-estate development projects in which he had an interest; and (ii) purchase the rights to manage the investments of a reinsurance trust with a $34 million portfolio of assets ("Reinsurance Trust").  The Reinsurance Trust held the assets for the benefit of a North Carolina life insurance company, and was required to hold sufficient assets and to manage them so the insurance company could pay life insurance claims as they became due.

6.     Reifler's fraudulent conduct continued into 2015 when, serving as the investment adviser to the Reinsurance Trust, he misappropriated millions more by again diverting money into entities and ventures that he owned and controlled.

7.     As investment adviser to the Reinsurance Trust, Reifler owed it a fiduciary duty to act in its best interest and to fully disclose all material facts about the advisory relationship, including disclosing any conflicts of interest that might cause Reifler to put his own interests before those of the Reinsurance Trust.  In violation of this fiduciary duty, Reifler misused the Reinsurance Trust assets to pay off investors in another failing venture he operated and make investments in entities in which he had an interest, and acted contrary to the Reinsurance Trust governing documents, which required Reifler to invest in conservative investments.

8.     In June 2015, when it was discovered that Reifler had improperly invested the Reinsurance Trust's assets in illiquid and highly risky investments, Reifler forged documents and counter-party signatures to conceal the true nature and value of the Reinsurance Trust assets and make it appear that he had, in fact, invested

3

the assets properly.

9.      Reifler transferred millions of dollars of investor money to the Relief Defendants, all of which he owned or controlled.  Each of the Relief Defendants received illicit proceeds from Reifler's fraud to which they have no legitimate claim.

10.      As a result of these frauds, Reifler and the Relief Defendants improperly received more than $16 million of ill-gotten gains and forced a North Carolina life insurance company into receivership because of its inability to pay policyholder claims.

11.      Reifler's conduct in connection with the Nevada-Chartered Company violates the Securities Act and Exchange Act, and his conduct with respect to the Reinsurance Trust violates the Securities Act, the Exchange Act, and the Advisers Act.  Reifler has violated, and unless restrained and enjoined will continue to violate Section 10(b) and Rule 10b-5 of the Exchange Act, Section 17(a) of the Securities Act, and Sections 206(1) and 206(2) of the Advisers Act.

12.      Consequently, the SEC requests that the Court enter an order enjoining Reifler from further violations of these provisions and from participating in the issuance, purchase, offer, or sale of any security, except in his own personal account; requiring Reifler to pay disgorgement and prejudgment interest thereon on a joint-and-several basis with the Relief Defendants; and requiring Reifler to pay third-tier civil penalties, since he acted fraudulently and created substantial losses.

## **<u>DEFENDANT</u>**

13.      **Bradley C. Reifler**, age 60, resides in New York, New York.  Reifler is the founder and Chief Executive Officer ("CEO") of Relief Defendants Forefront Partners and Forefront Capital Services and the sole member of Relief Defendant Port Royal-NCM.  Since 2014, Reifler has been associated with an SEC-registered investment adviser.

14.      In January 2017, Reifler filed for Chapter 7 bankruptcy protection in the United States District Court for the Southern District of New York (Case No. 17-

35075). The court found Reifler to be in contempt of prior court orders by intentionally destroying evidence in that proceeding, which is currently pending.

15. Reifler previously was associated with broker-dealers registered with the SEC and held Series 7, 24, and 63 licenses. In 1990, the Commodity Futures Trading Commission ("CFTC") issued a disciplinary order fining him $59,033 for violating the Commodity Exchange Act and regulations thereunder. In 2016, the State of Massachusetts issued a disciplinary order fining Reifler $36,000 for his failure to disclose the CFTC Order.

16. In 2018, a Financial Industry Regulatory Authority ("FINRA") Hearing Panel barred Reifler from associating with any FINRA member firm for refusing to answer questions related to this case. During 2019, after Reifler appealed this decision, the National Adjudicatory Council for FINRA affirmed the 2018 FINRA Hearing Panel decision.

## RELIEF DEFENDANTS

17. **Forefront Partners** is a Delaware limited liability company ("LLC") with its principal office and place of business in New York, New York. Reifler is the founder of and controls Forefront Partners.

18. **Forefront Capital Services** is a Delaware LLC with its principal office and place of business in New York, New York. Reifler is the founder of and controls Forefront Capital Services.

19. **Port Royal-NCM** is a Delaware LLC with its principal office and place of business in New York, New York. Reifler is the sole member of and controls Port Royal-NCM.

## FACTS

I. **Reifler Founded and Controls Numerous Forefront Entities.**

20. In 2009, Reifler established a financial services enterprise that purported to include asset management, investment banking, and investment advisory arms all doing business under the name "Forefront Capital."

5

21. Since that time, these and other Forefront Capital business lines have operated under various names as separate LLCs, all wholly-owned by Forefront Capital Holdings, LLC ("Forefront Capital Holdings"), which is owned 85% by a Reifler family trust and 15% by Reifler's mother.

22. Since 2009, Reifler has formed and closed numerous entities bearing the name "Forefront," but two entities have remained constant: Forefront Partners and Forefront Capital Services. Forefront Partners operates as a specialty-financing company, providing capital to various enterprises, largely in the form of business loans. Forefront Capital Services operates as a bill-paying entity, paying the rent, utilities, payroll, and other services on behalf of Reifler's Forefront Capital entities.

23. Reifler has held himself out as founder, President, CEO, Managing Member, and member of Forefront Partners and Forefront Capital Services. At all relevant times, Reifler exercised exclusive control over the business operations and investment activities of the Forefront Capital entities, including Forefront Partners and Forefront Capital Services.

II. **Reifler Defrauded a Nevada-Chartered Company in Violation of the Securities Act and Exchange Act.**

A. **The Terms of the Investment.**

24. In or around October 2014, a Nevada-Chartered Company was seeking opportunities to earn enhanced returns on un-invested cash held in customer accounts. Companies like the Nevada-Charted Company provide, among other things, custodial services for institutions, corporations, charities, and individuals.

25. Reifler, who had previously worked with the Nevada-Chartered Company in other capacities, approached it about investing in Forefront Talking Capital Investment, LLC ("Forefront Talking Capital"). Reifler founded Forefront Talking Capital, served as its sole-member, and controlled its bank accounts. Reifler proposed that Forefront Talking Capital would use the Nevada-Chartered Company's funds to provide short-term financing to certain small and medium-sized

telecommunications carriers ("Telecom Financing").

26. On or about November 24, 2014, Forefront Talking Capital and the Nevada-Chartered Company entered into an Investment Agreement ("Investment Agreement") pursuant to which the Nevada-Charted Company invested $6 million of its customers' un-invested cash with Forefront Talking Capital. Reifler signed the Investment Agreement on behalf of Forefront Talking Capital as its CEO and sole member.

27. The Investment Agreement stated that Forefront Talking Capital would use the Nevada-Chartered Company's money solely to provide Telecom Financing. Reifler also represented that Forefront Talking Capital pledged and granted the Nevada-Chartered Company a lien and security interest in all Forefront Talking Capital's rights to the Telecom Financing ("Collateral") and that such lien and security interest would be a first-priority security interest.

28. In exchange for the Nevada-Chartered Company's $6 million investment in Forefront Talking Capital, a different Forefront entity controlled by Reifler, Forefront Partners, issued to the Nevada-Chartered Company six $1 million promissory notes, each dated December 1, 2014, and signed by Reifler (the "Forefront Partners Notes"). The Forefront Partners Notes were one-page documents containing the duration (between 30 and 208 days) and interest rate applicable to each note (five of the notes had a 10% annual interest rate, while the sixth note had a 5% annual interest rate).

29. In a December 12, 2014 email from a Forefront representative, copying Reifler, the Forefront Partners Notes were delivered to the Nevada-Chartered Company.

30. The next day, via an email copying Reifler, the President of the Nevada-Chartered Company took exception to the Forefront Partners Notes being issued without any mention of the Collateral and that Forefront Partners, instead of Forefront Talking Capital, had issued the Notes. Later that same day, Reifler sent an

email to the President of the Nevada-Chartered Company stating: "[n]o problem. I completely understand. We will change it."

31. In a December 14, 2014 email, the Chief Fiduciary and Compliance Officer for the Nevada-Chartered Company responded to Reifler's email, stating that even though Reifler had agreed to correct the error, the Nevada-Chartered Company felt uncomfortable since "the monies we're sending you belong to the clients of [Nevada-Chartered Company] and we have an obligation to ensure they are protected."

32. Later that same day, Reifler sent an email to the Nevada-Chartered Company, that he signed as Founder and CEO of Forefront Capital, reiterating that the Investment Agreement that was "signed specifically details [that the Forefront Partners Notes] are backed by the collateral described" and "I assure you" that it is a "binding contract that should give you great confidence and safety surrounding these short-term notes." In another email that same day to the Nevada-Charted Company, Reifler stated that the Investment Agreement "is the binding understanding."

33. Despite Reifler's representations to the Nevada-Chartered Company that he would issue new notes consistent with the terms of the Investment Agreement, Reifler did not cause Forefront Talking Capital to issue new notes.

34. Reifler later proposed in a Letter of Intent to the Nevada-Chartered Company, dated February 26, 2015, that the Nevada-Chartered Company would execute a novation and a new investment agreement, which would change the Collateral backing the Nevada Chartered Company's $6 million investment. However, the Nevada-Chartered Company did not receive the proposed novation or investment agreement.

35. In the Letter of Intent, Reifler also falsely claimed that Forefront Talking Capital had already purchased $6 million worth of Telecom Financing. This statement was false. In fact, Reifler used the Nevada-Chartered Company's investment for other purposes. For example, Reifler ultimately sent $1.75 million of

the Nevada-Chartered Company's $6 million investment to cover expenses related to real-estate development projects in which he had an interest.

36.    Other than a few, small interest payments, Reifler never repaid the $6 million investment by the Nevada-Chartered Company.

**B.    Reifler Made False and Misleading Statements Regarding the Nevada-Chartered Company's $6 Million Investment.**

37.    Reifler made material misrepresentations and omissions to the Nevada-Chartered Company regarding the use of its funds and the safety of its investment.

38.    As detailed more fully above, in the Investment Agreement and in email communications with the Nevada-Chartered Company, Reifler represented:  i) that the Company's investment would be used to provide Telecom Financing; and ii) that Forefront Talking Capital granted the Company a first-priority lien and security interest in the Telecom Financing.

39.    A reasonable investor would have understood from Reifler's statements that the Nevada-Chartered Company's investment would be used for Telecom Financing and that the investment was secured, with a first priority lien in the Collateral.

40.    Each of the above representations regarding how the Nevada-Chartered Company's investment would be used and its safety were false and misleading when made.  Reifler's statements were false and misleading because Reifler intended to and did use the Nevada-Chartered Company's investment for purposes inconsistent with those representations.

41.    Reifler knew at the time the Nevada-Chartered Company made its investment with Forefront Talking Capital that he intended to misappropriate those funds, and that he would use the misappropriated funds for other projects having nothing to do with Telecom Financing.

42.    Days after the investment was made and prior to issuing the Forefront Partners Notes to the Nevada-Chartered Company and making the statement about

9

the "safety" of its investment, in a December 3, 2014 email, Reifler informed an insurance actuary ("Individual-1"), who was engaged in discussions with Reifler about acquiring investment control over the Reinsurance Trust, that he planned to use the Company's funds to finance the acquisition of the Reinsurance Trust by "taking the 6 mln from" the "telecom investment."

43.    Reifler misappropriated the $6 million that the Nevada-Chartered Company had invested.  Reifler initially placed the Nevada-Chartered Company's $6 million investment into a Forefront Talking Capital account, which he controlled.  On or about February 26, 2015, Reifler misappropriated the $6 million by transferring these funds to an account in the name of Port Royal-NCM, which he controlled.

44.    Over the course of the next few days, Reifler spent $1.75 million of the misappropriated funds to cover expenses related to real-estate development projects in which he had a personal interest.  Specifically, Reifler wired funds to two projects that were associated with a real-estate development company ("Real Estate Company").  When Reifler wired the funds, Forefront Partners owned approximately 40% of the Real Estate Company, Reifler was continuing to serve as a financial consultant to the Real Estate Company, and a Reifler-family trust owned an interest in the two real-estate development projects.  Reifler's wire transfers were as follows:

(a)    On or about February 27, 2015, Reifler wired $1.5 million from the Port Royal-NCM account to a real-estate development project located in Chicago in which a Reifler-family trust owned approximately 26%; and

(b)    On or about March 9, 2015, Reifler wired $250,000 from the Port Royal-NCM account to a real-estate development project located in Hawaii in which a Reifler-family trust owned approximately 21%.

45.    As alleged in further detail below, on or about April 27, 2015, Reifler diverted the remaining $4.25 million of the Nevada-Chartered Company's funds that he had misappropriated to acquire investment control over the Reinsurance Trust assets.  Reifler would then have the opportunity to share in any profits stemming

from Reinsurance Trust's investments.

46.     In addition, Forefront Talking Capital did not have any right to collateral since, contrary to Reifler's representations, it did not engage in the Telecom Financing.  Therefore, Reifler could not and did not place the Nevada-Chartered Company in a "first-priority position."

47.     Reifler knew, or was reckless in not knowing, that his statements regarding how he would use the Nevada-Chartered Company's investment and about its safety were false.  As evidenced by his December 3, 2014 email to Individual-1, Reifler knew at the time the Nevada-Chartered Company made its investment that he planned to use the $6 million for uses other than Telecom Financing.  Reifler knew that his representations about the safety of the investment, including that the investment would be supported by Collateral to which the Nevada-Chartered Company would have "first-priority" position, were false, because he planned to use the investor's money for uses other than Telecom Financing,

48.     In addition, Reifler acted negligently by failing to exercise reasonable care by using the funds in a manner that was inconsistent with disclosures to the Nevada-Chartered Company, making materially false and misleading representations to the Company, and failing to obtain the Collateral.

49.     The representations regarding how Reifler would use the Nevada-Chartered Company's investment and its safety were material to the Company.  A reasonable investor would have considered it important to know that Reifler was using their funds in a manner entirely inconsistent with the Investment Agreement and that their investment was not backed by the Collateral, especially when Reifler represented the Investment Agreement "should give you great confidence and safety surrounding" the investment.

**C.     Reifler Offered and Sold Securities to the Nevada-Chartered Company.**

50.     Reifler offered and sold securities to the Nevada-Chartered Company as

defined by the federal securities laws.

51. The Forefront Partners Notes, the governing terms of which were outlined and agreed upon by Reifler and the Nevada-Chartered Company pursuant to the Investment Agreement, operated as a security as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, "investment contracts." An investment contract exists where a person invests his or her money, in a common enterprise, and is led to expect profits from the efforts of the promoter or a third party.

52. The Nevada-Chartered Company invested $6 million in a common enterprise, Forefront Talking Capital. The Company invested with the expectation of profits (by earning enhanced returns, in the form of interest paid on the Forefront Partners Notes, on un-invested cash in its customer's accounts) from Reifler's efforts.

53. The Nevada-Chartered Company obtained the $6 million it invested with Reifler through Forefront Talking Capital by pooling its customer's accounts held at the Nevada-Chartered Company.

54. The success of the Nevada-Chartered Company's investment with Forefront Talking Capital was based solely on Reifler's ability to find profitable opportunities to invest the Company's funds in Telecom Financing.

55. In addition, the Forefront Partners Notes, the governing terms of which were outlined and agreed upon by Reifler and the Nevada-Chartered Company pursuant to the Investment Agreement, operated as a note, which is a security as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, "any note."

56. Reifler was motivated to obtain $6 million from the Nevada-Chartered Company to raise money for his business, Forefront Talking Capital. The Nevada-Chartered Company was motivated to invest $6 million with Reifler through

Forefront Talking Capital in order to obtain a profit through earning enhanced returns (in the form of interest paid on the notes) on cash in its customer's accounts.

57. The reasonable expectation of the investing public is that the Forefront Partners Notes (the governing terms of which were outlined and agreed upon by Reifler and the Nevada-Chartered Company pursuant to the Investment Agreement), would be deemed a security. In the Investment Agreement – which set forth the terms of the investment -- the Nevada-Chartered Company is repeatedly referred to as an "investor" or making an "investment" and that the instrument is "being offered and sold in reliance on one or more exemptions from the registration requirements of the Securities Act."

58. No other regulatory scheme exists that significantly reduces the need for the federal securities laws to apply to the Forefront Partners Notes (the governing terms of which were outlined and agreed upon by Reifler and the Nevada-Chartered Company pursuant to the Investment Agreement).

**III. Reifler's Fraud In Connection with the Reinsurance Trust Violated the Securities Act, the Exchange Act, and the Advisers Act.**

**A. Reifler Became the Investment Manager to a $34 Million Reinsurance Trust.**

59. In November 2014, Reifler and Individual-1, an insurance actuary, engaged in discussions about an opportunity for Reifler to obtain investment control over a multi-million dollar Reinsurance Trust.

60. In typical reinsurance transactions, reinsurance entities simultaneously acquire a block of assets (typically cash or an investment portfolio) and liabilities (insurance claim obligations) from insurance companies or third parties. As relevant here, a Reinsurance Trust that would be controlled by Reifler and Individual-1 planned to assume a portion of the life insurance liabilities of a North Carolina life insurance company (the "North Carolina Life Insurance Company"), and the Reinsurance Trust would be responsible for making payments to it on a monthly basis

to pay for servicing fees and claims. Reifler and Individual-1 reached a verbal agreement whereby Reifler would invest the assets of the Reinsurance Trust, and then Reifler and Individual-1 would split the profits after paying servicing fees and claims.

61. Prior to establishing the Trust to hold the North Carolina Life Insurance Company assets, a prior reinsurer ("Prior Reinsurer") held the assets. In order to facilitate the buy-out of the Prior Reinsurer, a new reinsurer owned by Individual-1 ("New Reinsurer") entered into a $34 million Reinsurance Trust Agreement ("Trust Agreement") with the North Carolina Life Insurance Company and simultaneously acquired a portfolio of life insurance policies through a novation agreement with the Prior Reinsurer.

62. Pursuant to the Trust Agreement and applicable state law, the new reinsurer was required to hold assets sufficient to cover its future obligations under the Trust Agreement and for its assets to be managed consistent with the Trust Agreement and North Carolina law.

63. In accordance with the Trust Agreement, approximately $29 million of the Prior Reinsurer assets were deposited into the Reinsurance Trust account ("Trust Account") at the Nevada-Chartered Company in the name of the Reinsurance Trust. Pursuant to the Trust Agreement, the Nevada-Chartered Company was the Trustee and the North Carolina Life Insurance Company was the beneficiary of the Reinsurance Trust.

64. To consummate this transaction and acquire investment control over the Reinsurance Trust, Reifler was required to add $5 million to the Reinsurance Trust assets to buy out the Prior Reinsurer because the Prior Reinsurer was allowed to keep $5 million as a "ceding commission."

65. As explained above, Reifler used funds he had misappropriated from the Nevada-Chartered Company to make a partial payment of the ceding commission. Specifically, on or about April 27, 2015, as partial payment of the ceding commission, Reifler transferred $4.25 million of the Nevada-Chartered Company's

14

investment that he had misappropriated from the Port Royal-NCM account to the Trust Account, leaving a $750,000 shortfall that Reifler never funded.

**B.    Reifler Acted as an Investment Adviser to the Reinsurance Trust.**

66.    As described above, through a series of transactions, in April 2015, Reifler became the investment adviser to the Reinsurance Trust.

67.    Pursuant to the Trust Agreement, which permitted the New Reinsurer to appoint an "Investment Manager" to manage the assets held by the Reinsurance Trust ("Reinsurance Trust Assets"), Reifler became the Investment Manager.  In that role, Reifler advised the Reinsurance Trust by directing the investment of Reinsurance Trust Assets, and expected to (and did) receive compensation from advising the Reinsurance Trust.

68.    In his sole discretion, Reifler controlled the investments, purchases, and sales the Reinsurance Trust made.  The Trust Agreement contemplated investments in securities and the investments that Reifler chose for the Reinsurance Trust included the purchase of securities, as described below.

69.    Reifler was engaged in the business of acting of advising others as an investment adviser. He held himself out to Individual-1 and to the North Carolina Insurance Company as having considerable investment acumen and was ultimately responsible for, and did, identify and facilitate all of the investments, purchases, or sales from the Reinsurance Trust Assets.  As described below, these investments included securities such as the purchases of FIT shares and the Forefront Partners $10 million note.

70.    Reifler expected to receive compensation from the investments, purchases, or sales from the Reinsurance Trust Assets in the form of a share of the profits generated by those investments or purchases.  In addition, Reifler received compensation by misappropriating the Reinsurance Trust Assets, including taking a nearly $500,000 dividend, using the Reinsurance Trust Assets in ways that did not benefit the Reinsurance Trust, to pay off debts of ventures operated by Reifler, and

providing liquidity to struggling entities in which Reifler had an economic interest.

**C.    Reifler's Fiduciary and Other Obligations to the Reinsurance Trust.**

71.    As investment adviser to the Reinsurance Trust, Reifler owed a fiduciary obligation to it.  As such, Reifler owed the Reinsurance Trust an affirmative duty of utmost good faith, he had an affirmative obligation to employ reasonable care to avoid misleading it, he had a duty to act in its best interest, and he was obligated to provide full and fair disclosure of all material facts, including a duty to tell it about all actual or potential conflicts of interest that might incline him to render investment advice that was not disinterested.

72.    Furthermore, as the Investment Manager to the Reinsurance Trust, Reifler was required to follow specific investment guidelines pursuant to the Trust Agreement and under North Carolina state law that governed the assets that the Reinsurance Trust could hold.  The Trust Agreement referred to those investments as "eligible" investments and they included reasonably liquid, verifiable, and unleveraged asset classes (*i.e.*, bonds, U.S. Treasuries, cash, and publicly-traded stocks).

73.    The investment guidelines set forth general risk avoidance principles and provided specific guidance on appropriate investments and concentration limits with regards to certain types of asset classes.  For example, notes or other interest-bearing instruments were permitted provided they did not exceed 3% of the Reinsurance Trust's holdings.  In addition, the Reinsurance Trust was prohibited from acquiring more than a 50% interest of the securities of any entity.

74.    Individual-1 made Reifler aware of those investment guidelines prior to Reifler making investments on behalf of the Reinsurance Trust.

**D.    Reifler Engaged in Deceptive Conduct While Acting as the Investment Adviser to the Reinsurance Trust.**

75.    Once Reifler became the investment adviser to the Reinsurance Trust, on or about April 30, 2015, he immediately began orchestrating and engaging in

deceptive acts to defraud the Reinsurance Trust of its assets to benefit himself and his related entities, including misappropriating trust assets, using the Reinsurance Trust Assets to benefit himself and entities he controlled, failing to disclose his conflicts of interest, and investing $20 million of Trust's Assets in investments that did not comply with the Trust Agreement or North Carolina law.

76.    The Reinsurance Trust had approximately $34 million in total for Reifler to invest.  Reifler caused the Reinsurance Trust to improperly invest $10 million of those assets in a short-term note backed by an entity he controlled, $10 million in a closed-end fund for which he served as the Chairman of its Board of Trustees (as well as the CEO of the fund's registered investment adviser), and the remainder to fund other ventures, such as real-estate projects and sub-prime auto debt financing.

### 1.    Reifler Misappropriated $10 Million of the Reinsurance Trust Assets by Diverting Funds to Another Entity He Controlled.

77.    On or about May 1, 2015, Reifler caused the Reinsurance Trust to wire $10 million to an account in the name of Forefront Partners Short-Term Notes, LLC ("Forefront Partners Short-Term Notes").  Forefront Partners Short-Term Notes was formed purportedly to facilitate the deposit of short-term investments in Forefront Partners.  Reifler was the sole-member of Forefront Partners Short-Term Notes and he controlled it and its bank account.

78.    In exchange for the Reinsurance Trust's investment, Forefront Partners issued a $10 million promissory note to the Reinsurance Trust at 12% interest ("Forefront Partners $10 Million Note to the Reinsurance Trust").

79.    At the time it issued the Forefront Partners $10 Million Note to the Reinsurance Trust, Forefront Partners had virtually no money in its accounts and Reifler began misusing this investment for his own benefit; therefore, Forefront Partners had no readily apparent means of repaying the note or the specified interest. Hence, Reifler did not have a basis to believe that Forefront Partners could make the necessary 12% interest payments or return the $10 million of principal to the

17

Reinsurance Trust.

80. The Trust Agreement and North Carolina law prohibited Reifler from making this investment with the Trust's Assets because the Forefront Partners $10 Million Note to the Reinsurance Trust constituted almost a third of the Reinsurance Trust Assets, which greatly exceeded the 3% limit for interest bearing instruments.

81. Reifler violated his fiduciary obligations and defrauded the Reinsurance Trust by making investments with the Reinsurance Trust's Assets that did not benefit the Reinsurance Trust and were not in its best interest.

82. On or about May 4, 2015, three days after receiving the $10 million from the Reinsurance Trust, Reifler wired $610,000 of this money to an individual who had previously invested in Forefront Partners in satisfaction of a principal payment on a note. On or about May 13, 2015, Reifler wired another $400,000 to this same Forefront Partners' investor, again, in satisfaction of a principal payment. These payments did not benefit the Reinsurance Trust and benefitted Reifler by retiring debts of an entity that he controlled.

83. Reifler further breached his fiduciary duties and defrauded the Reinsurance Trust by misappropriating the remaining $9 million to fund the operations and business expenses of Forefront Partners and Forefront Capital Services, including paying expenses associated with outside legal and consulting services and payroll.

84. None of the $10 million that Reifler misappropriated from the Reinsurance Trust was used on behalf of, or to benefit, the Reinsurance Trust. Reifler has only returned a very small portion of the $10 million to the Reinsurance Trust.

85. As the investment adviser to the Reinsurance Trust, Reifler failed to provide full and fair disclosure of all material facts regarding this investment to the Reinsurance Trust. Specifically, he did not disclose his conflicts of interest in investing Reinsurance Trust Assets in an entity he controlled.

18

86. Reifler defrauded the Reinsurance Trust and violated his fiduciary obligations to it by knowingly or recklessly: (i) misappropriating the Reinsurance Trust Assets; (ii) purchasing securities (i.e., the Forefront Partners $10 Million Note) that were prohibited by the Trust Agreement and North Carolina law; (3) making investments that did not benefit the Reinsurance Trust; (iv) failing to disclose all material facts regarding this investment to the Reinsurance Trust; and (v) failing to disclose the conflicts of interest he had when he invested the Reinsurance Trust Assets in an entity he controlled.

87. Reifler also acted negligently by failing to exercise reasonable care in managing the Reinsurance Trust Assets in a manner that was consistent with the Trust Agreement and in the best interest of the Reinsurance Trust. Additionally, Reifler acted negligently by failing to disclose the conflicts of interest associated with him investing Reinsurance Trust Assets into an entity he controlled.

**2.     The Forefront Partners $10 Million Note to the Reinsurance Trust Was a Security.**

88. Reifler offered and sold the Forefront Partners $10 Million Note to the Reinsurance Trust, which was a security as defined by the federal securities laws.

89. In particular, the Forefront Partners $10 Million Note to the Reinsurance Trust operated as an investment contract as the Reinsurance Trust invested money into a common enterprise, Forefront Partners Short-Term Notes, with the expectation of profits from Reifler's efforts.

90. Reifler caused the Reinsurance Trust to invest $10 million in the Forefront Partners $10 Million Note to the Reinsurance Trust.

91. Reifler then pooled or commingled the Reinsurance Trust's investment in the Forefront Partners $10 Million Note to the Reinsurance Trust with other investors' funds. In total, there were approximately 21 investors who invested in short-term notes issued by Forefront Partners.

92. Reifler caused the Reinsurance Trust to invest in the Forefront Partners

$10 Million Note to the Reinsurance Trust to earn a 12% rate of return.

93. The success of the Reinsurance Trust's investment was based solely on Reifler's ability to find profitable opportunities for Forefront Partners to invest the Reinsurance Trust's funds in ventures that could generate a 12% rate of return.

94. In addition, the Forefront Partners $10 Million Note to the Reinsurance Trust also constituted a "note" as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, "any note."

95. Reifler was motivated to obtain $10 million from the Reinsurance Trust to raise money for his business, Forefront Partners. The Reinsurance Trust was motivated to invest $10 million with Reifler in order to obtain a profit in the form of a 12% interest rate.

96. As alleged above, 21 investors purchased short-term notes issued by Forefront Partners.

97. The reasonable expectation of the investing public is that the Forefront Partners $10 Million Note to the Reinsurance Trust was a security. Reifler referred to the Forefront Partners $10 Million to the Reinsurance Trust as an investment.

98. No other regulatory scheme exists that significantly reduces the need for the federal securities laws to apply to the Forefront Partners $10 Million to the Reinsurance Trust.

**3. Reifler Improperly Diverted Another $10 Million of the Reinsurance Trust Assets to Purchase Shares of a Fund He Managed.**

99. Forefront Income Trust ("FIT") is a closed-end fund that invested in a portfolio of unrated or below-investment-grade loans and debt instruments. At various times since FIT's inception in December 2014, Reifler has served as its trustee, President, CEO, Chairman of the Board of Trustees, and "Principal Executive

Officer." Reifler also served as the CEO of FIT's registered investment adviser, Forefront Capital Advisers, LLC.

100. On or about May 4, 2015, just days after acquiring control of the Reinsurance Trust Assets, Reifler caused the Reinsurance Trust to wire $10 million to FIT in exchange for approximately 90% of FIT's shares. At the time, Reifler was serving as the Chairman of FIT's Board of Trustees.

101. The Trust Agreement and North Carolina law prohibited Reifler from making this investment with the Reinsurance Trust Assets because the investment of approximately 90% of FIT's shares was more than the 50% limit on the securities that the Reinsurance Trust could own of any entity.

102. Reifler did not disclose his conflict of interest stemming from him serving as the Chairman of FIT's Board of Trustees as well as the CEO of FIT's registered investment adviser at the time of the investment.

103. Reifler also misappropriated a FIT dividend owed to the Reinsurance Trust. On or about December 31, 2015, FIT issued a $495,048 dividend to the Reinsurance Trust. This dividend in its entirety did not reflect a profit to Reifler and should have been wired to a Trust account to properly account for the returns owed to the Reinsurance Trust. Instead, on or about January 7, 2016, Reifler misappropriated the dividend from the Reinsurance Trust by having the entire amount wired to a bank account of an entity he controlled, Port-Royal-NCM. In January and February 2016, approximately $495,000 of this amount that Reifler had misappropriated was transferred to accounts in the name of Forefront Partners and Forefront Capital Services, entities Reifler controlled, and thereafter used for those entities' business expenses.

104. Reifler defrauded the Reinsurance Trust and violated his fiduciary obligations to it by knowingly or recklessly: (i) misappropriating the FIT dividend; (ii) using the Reinsurance Trusts Assets to purchase approximately 90% of FIT's shares when he knew or was reckless in not knowing that this investment was

prohibited by the Trust Agreement and North Carolina law; (iii) failing to disclose to disclose all material facts regarding this investment to the Reinsurance Trust; and (iv) failing to disclose his conflicts of interest from investing the Reinsurance Trust Assets in an entity for which he served as an executive officer and as the CEO of its registered investment adviser.

105.   In addition, Reifler also acted negligently by failing to exercise reasonable care in managing the Reinsurance Trust Assets in a manner that was consistent with the Trust Agreement and in the best interest of the Reinsurance Trust. Namely, Reifler did not exercise reasonable care when he did the following: (i) wired the entire FIT dividend to a bank account of an entity he controlled, Port-Royal-NCM; (ii) used the Reinsurance Trust Assets to purchase approximately 90% of FIT's shares as the investment was prohibited by the Trust Agreement and North Carolina law; (iii) failed to disclose all material facts regarding the FIT investment to the Reinsurance Trust; and (iv) failed to disclose his conflicts of interest stemming from his investment of the Reinsurance Trust Assets in an entity for which he served as an executive officer and as the CEO of its registered investment adviser.

106.   The FIT shares are securities as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.  Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, any "stock."

**4.    Reifler's Other Uses of the Reinsurance Trust Assets.**

107.    Reifler kept approximately $4 million of the Reinsurance Trust Assets in a money market account at the Nevada-Chartered Trust Company, and used an additional $10 million in Trust Assets to fund other ventures, such as real estate projects, telecommunications financing, and sub-prime auto debt financing.

**E.    Reifler's Cover-Up Violated the Advisers Act and Demonstrated His High Degree of Scienter.**

108.   In late June 2015, Individual-1 asked for a list of investments made with

the Reinsurance Trust Assets.  On or about June 26, 2015, he was provided with the holdings and immediately recognized that Reifler had used the Reinsurance Trust Assets to purchase ineligible investments.  From approximately July through December 2015, Individual-1 attempted to work with Reifler to realign the Reinsurance Trust Assets to comply with the Trust Agreement and North Carolina law.

109.   Rather than disclose the true nature and value of the Reinsurance Trust Assets throughout this process, Reifler engaged in an elaborate deception to make it appear as if the Reinsurance Trust Assets had been properly reallocated.

110.   These deceptive acts were further breaches of Reifler's fiduciary obligations to the Reinsurance Trust and demonstrate that Reifler knew, or was reckless in not knowing, that his investments did not comply with the Trust Agreement and North Carolina law.

111.   First, faced with an urgent need to reallocate the Reinsurance Trust Assets and to provide documentation to the Trustee, Reifler prepared fictitious notes, mortgages, and other agreements as evidence of a purported reallocation. Specifically, Reifler fabricated at least: (i) 15 mortgage loans and notes purporting to show investments in real-estate projects; (ii) an equipment financing note and a security agreement purporting to show an investment in a delivery service; (iii) a letter from the delivery service's CEO indicating that the Reinsurance Trust had a "first lien against all" of the delivery service's assets and a valuation letter from the delivery service's financial adviser; (iv) three loan agreements and notes purporting to show investments in real-estate development projects; and (v) 12 notes and security agreements purporting to show investments in Telecom Financing through Forefront Talking Capital.  Reifler caused these fabricated documents to be provided to the Trustee of the Reinsurance Trust, even though none of these investments had been made.

112.   Reifler fabricated other documents as well, which also demonstrate that

he knew, or was reckless in not knowing, that the Reinsurance Trust Assets were invested contrary to the Trust Agreement and North Carolina law.

113. Prior to submitting the 12 notes and security agreements behind the purported Forefront Talking Capital investment described above, all of which were signed by Reifler on behalf of Forefront Talking Capital, Reifler sent to Individual-1 seven different notes and security agreements purporting to show other investments by the Reinsurance Trust in Forefront Talking Capital. None of these investments were ever made.

114. Individual-1 pointed out to Reifler that these seven purported investments violated the concentration limits imposed by the Trust Agreement and North Carolina law. Thus, in order to give the appearance that the Reinsurance Trust's holdings were below the concentration limits, Reifler prepared the 12 forged notes and security agreements described above to give the false impression that the Reinsurance Trust's existing holdings had been broken out in a manner to comply with the concentration limits.

115. Second, Reifler caused counter-party signatures to be forged on at least the real-estate and real-estate development project documents, the delivery service documents, and the seven notes and security agreements purporting to show other investments in Forefront Talking Capital. Reifler also caused these forged documents to be provided to the Trustee of the Reinsurance Trust.

116. Third, on numerous occasions, Reifler caused the fictitious investments described above to be included on the Reinsurance Trust's account statements or in other communications with its Trustee or Individual-1. On at least three occasions, Reifler provided the Trustee with lists reflecting these investments so that they could be included in the Reinsurance Trust's account statements, and on at least two occasions these investments were reflected on an account statements distributed to Individual-1.

117. In addition, after the fictitious papers evidencing the reallocation were

24

provided to Individual-1 and the Trustee, Reifler directed an associate to falsely represent to the Trustee that "we have realigned the portfolio to comply with the regulatory authorities" and ask that "the current holdings be reflected as such" on account statements issued by the Trustee.

118.    Reifler caused the account statements to contain other inaccuracies. Prior to orchestrating the fictitious reallocation, and although Reifler had improperly diverted $1.75 million in funds *from* the Nevada-Chartered Company's original $6 million investment in Forefront Talking Capital for investment in the Real Estate Company's projects, Reifler caused this $1.75 million to be represented as an "investment" *by the Reinsurance Trust* on account statements issued by the Trustee.

119.    Ultimately, of the $1.75 million that Reifler had diverted *from* the Nevada-Chartered Company for the Real Estate Company's Chicago and Hawaii projects, Reifler obtained a repayment of $1.1 million.  Rather than returning those funds to the Nevada-Chartered Company, Reifler distributed these funds to the Reinsurance Trust.

120.    Reifler also secretly attempted to obtain the repayment of funds from the Real Estate Company to satisfy inquiries by the North Carolina insurance auditors during an audit in August 2016.  Reifler acknowledged that prior to acquiring control of the Reinsurance Trust assets, he "did something very wrong" and "sent money that I shouldn't have sent to [the Real Estate Company]."  He also admitted that he "set up a loan . . . to cover my ass because it was [dated] after I got the portfolio."  Reifler's statements were recorded by a principal of the Real Estate Company.

121.    Reifler knew, or was reckless in not knowing, that the notes, mortgages and other agreements purportedly evidencing a re-allocation of Trust's Assets were forgeries and contained forged signatures, that the Reinsurance Trust's account statements contained investments that were not made by the Trust, and that he should not have caused these forged and false documents to be provided to the Trustee.

122.     In addition, Reifler acted negligently by failing to exercise reasonable

care by providing fabricating notes, mortgages and other agreements purportedly evidencing a re-allocation of the Reinsurance Trust Assets, by providing information causing the Reinsurance Trust's account statements to contain investments that were not made by the Reinsurance Trust, and by causing these forged documents to be provided to the Trustee.

### F.    Reifler's Fraudulent Conduct Was Material.

123.    Reifler's fraudulent conduct was material.  A reasonable client (i.e., the Reinsurance Trust and its trustee) would consider Reifler's financial interest in the investments he selected, how the investments Reifler selected did not benefit the Reinsurance Trust, his failure to disclose conflicts of interests, and the violations of the Trust Agreement and North Carolina law, as important facts that would substantially alter the total mix of information available in evaluating whether to select and continue to use Reifler as its investment adviser.

124.    In addition, Reifler's purported reallocation concealed the nature and value of the Reinsurance Trust Assets, gave the false impression that the Reinsurance Trust Assets were invested in accordance with the Trust Agreement and North Carolina law, and prevented the Reinsurance Trust from mitigating any potential losses by, for example, immediately exercising its rights to withdraw remaining assets.

125.    While the Reinsurance Trust was able to recuperate some of its money, Reifler's conduct caused the loss of approximately $26.5 million, and resulted in the North Carolina Insurance Company being placed in rehabilitation and under the management and control of a court-appointed receiver.

### IV.    Reifler and The Relief Defendants Received Proceeds from Reifler's Fraud to Which They Have No Legitimate Claim.

126.    Reifler controls all of the Relief Defendants.  Reifler and each of them obtained investor's funds without any basis; thus, it is unjust, inequitable, and unconscionable for any of them to retain those funds.

### A.    Forefront Partners and Forefront Capital Services Received Ill-Gotten Gains.

127.    In May 2015, Reifler transferred $10 million of Reinsurance Trust Assets to an account for Forefront Partners Short Term Notes, an entity and account that Reifler controlled.

128.    By the end of June 2015, Reifler transferred at least $8.1 million of this $10 million from Forefront Partners Short Term Notes to Forefront Partners and Forefront Capital Services.

129.    As explained in further detail below, Port Royal-NCM transferred nearly $500,000 of its ill-gotten gains to Forefront Partners and Forefront Capital Services.

130.    Forefront Partners and Forefront Capital received these proceeds from Reifler's fraud for which they provided no reciprocal goods or services in exchange, and to which they have no legitimate claim.

131.    Because Forefront Partners and Forefront Capital Services received at least $8.6 million in proceeds from Reifler's fraud and neither of them had any legitimate claim to those funds, Reifler and each of them have obtained an ill-gotten gain under circumstances in which it was not just, equitable, or conscionable for any of them to retain those funds.

### B.    Port Royal-NCM Received Ill-Gotten Gains.

132.    In February 2015, Reifler transferred the Nevada-Chartered Company's $6 million investment with Forefront Talking Capital from Forefront Talking Capital to Port Royal-NCM – an entity and account that Reifler controlled.  As alleged above, Reifler ultimately used these funds towards real-estate projects and to acquire investment control over the Reinsurance Trust.

133.    In January 2016, Reifler directed that the Reinsurance Trust's $495,048 December 31, 2015 FIT dividend be transferred to an account in the name of Port Royal-NCM, an entity and account that Reifler controlled.

134. From January through February 2016, Port Royal-NCM subsequently transferred nearly $500,000 to Forefront Partners and Forefront Capital Services.

135. Port Royal-NCM received these proceeds from Reifler's fraud for which it provided no reciprocal goods or services in exchange, and to which it has no legitimate claim.

136. Because Port Royal-NCM received nearly $6.5 million of proceeds from Reifler's fraud and because neither Reifler nor Port Royal-NCM has any legitimate claim to those funds, Port Royal-NCM and Reifler have obtained an ill-gotten under circumstances in which it was not just, equitable, or conscionable for either of them to retain those funds.

## FIRST CLAIM FOR RELIEF

### Violations of Sections 17(a) of the Securities Act

137. The SEC realleges and incorporates by reference above paragraphs 1 through 107, 110, and 120-136.

138. Reifler, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly, recklessly, and negligently: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

139. By engaging in the conduct described above, Defendant Reifler violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

140. The SEC realleges and incorporates by reference above paragraphs 1

through 107, 110, and 120-136.

141. Reifler, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly and recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

142. By engaging in the conduct described above, Reifler violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

**Violations of Sections 206(1) and 206(2) of the Advisers Act**

143. The SEC realleges and incorporates by reference above paragraphs 1-4, 6-23, and 59-136.

144. Reifler is an investment adviser as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

145. Reifler, while acting as investment adviser, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce, knowingly, recklessly, and negligently:  (a) employed or are employing devices, schemes or artifices to defraud clients or prospective clients; and (b) engaged in or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

146. By engaging in the conduct described above, Reifler violated, and unless restrained and enjoined, will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

29

# **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

## **I.**

Issue findings of fact and conclusions of law that Reifler committed the alleged violations.

## **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Reifler from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## **III.**

Enter a conduct-based injunction against Reifler permanently enjoining him from directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in the issuance, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts.

## **IV.**

Order Reifler, on a joint and several basis, with the Relief Defendants to disgorge all ill-gotten gains received from their illegal conduct, together with prejudgment interest thereon.

## **V.**

Order Reifler to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 209(e)(2)(c) of the Advisers Act [15 U.S.C. § 80b-9(e)(1)].

## **VI.**

A jury trial on all issues triable to the jury.

## **VII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  March 12, 2020

*s/: Christopher E. Martin*

Christopher E. Martin
Senior Trial Counsel
Attorney for Plaintiff
Securities and Exchange Commission

1961 Stout Street, Suite 1700
Denver, Colorado 80294
Telephone: (303) 844-1106
Facsimile: (303) 297-3529
martinc@sec.gov
